The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner, the records contained in the Commissions file in this matter, the packet of medical records submitted by defendants and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between the plaintiff and defendant-employer at all relevant times.
3. Plaintiffs average weekly wage is as set forth on the Form 22 (Wage Chart).
4. Plaintiff is alleging an injury by accident that occurred on January 2, 1998, resulting in an alleged injury to the back.
5. Defendant-employer has denied liability.
6. Plaintiff is seeking temporary total disability compensation from January 2, 1998, to present, as well as medical expenses.
7. The issues to be determined by the Commission are: whether plaintiff, in fact, suffered from a compensable injury by accident, and if so, what are the compensable consequences.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 34 years old. She has an eleventh grade education. Prior to working for the defendant-employer, plaintiff worked for a veterinary hospital, a bird sanctuary and several different restaurants. Previously, sometime around 1993, plaintiff slipped and fell while working at a restaurant. She landed on her tailbone and suffered a pinched nerve as a result. That injury healed with a five percent impairment rating.
2. Plaintiff began working for the defendant-employer in 1997. Her job consisted of installing custom interiors in large truck cabs. She worked inside the cab installing insulation, carpeting, sleeper units, and whatever other custom modifications the customer had ordered. She used hand tools, power tools and a glue gun. The shop where the trucks were modified was a large open building with high ceilings. Across from the truck bays was a paint booth. The paint booth was not large enough to pull an entire truck into, so often the trucks were painted in the shop, outside of the paint booth itself. There were large ventilation fans installed to exhaust fumes from the building. However, in the winter months, the fans were not run because of the cold. In January, the bay doors were all closed because of the weather.
3. On January 2, 1998, plaintiff was working inside a truck cab with a co-worker, Helen Shives, installing an interior. In the building, other workers were using plasma cutters to cut apart a truck body. The plasma cutter cuts through fiberglass and metal and creates fumes. The bay doors were closed because of the cold weather and the fumes inside the building were heavy. Plaintiff was working inside the cab when she was overcome by the fumes and fainted. Her co-worker had previously been overcome by the fumes and had previously fainted.
4. Plaintiffs testimony was to the effect that the fumes made her light-headed and while working on her knees she began to raise up but fell over backward, hitting her back against a piece of metal. She described the episode thusly:
 "And the next thing I know, things went black, and I went backwards. And when I woke up, I was laid against a piece of what we call flat bar. Its a bar in the center of the cab of the truck.
Further colloquy followed:
 Q. When you woke up, what part of your body was hitting what?
 A. The right hand side of my back, down almost between my shoulder blades and down the right hand side of my back, I was leaned against this piece of flat bar.
Q. How did you feel at that time?
A. I was hurting pretty bad.
 Q. Did you have any type of health problem that would cause you to pass out even away from work?
A. No, sir.
 Q. When you were in clean air, had you ever passed out that you're aware of?
A. No, sir.
 Q. Your back fell against a two inch or a one and a half to two inch flat bar; correct?
A. Yes, sir.
 Q. And you woke up. And my question is were you hurting in your chest area?
A. Not from like the flu or anything, no, sir.
 Q. I'm not asking what it was from, just where you were hurting, because you said you were hurting pretty —
A. Yeah.
Q. — bad is what your phrase was at that time.
A. Yes, sir.
 Q. And I'm trying to establish where it was that you were hurting badly?
 A. I hurt all over. My back hurt. It felt like everything that was in my back was coming out of my chest.
5. Plaintiff reported the injury to her supervisor, John Polson, who told her to go home. Because of her light-headedness, her friend drove her home. Plaintiff described her pains as being very severe in her right side. She went to her personal doctor, Dr. Rankin, who treated her with antibiotics as he suspected an infection. When she did not improve, she finally went to the emergency room where she was admitted by Dr. Warwick Aikens on January 14, 1998. Plaintiff was complaining of right posterior chest pain and urinary problems. After her discharge, plaintiff was still complaining of right flank pain. Dr. Aikens performed extensive testing for kidney problems, but did not find anything. He then began checking her for a rib fracture, doing chest x-rays, an ultrasound and an IVP. These also were negative. He then ordered thoracic and rib x-rays, an MRI, and a bone scan. These also were negative. By April, Dr. Aikens had performed all the tests he could, but still did not know the source of her pain. He suggested that she be evaluated at the Pain Center by Dr. Covington to help her deal with her chronic pain. Dr. Covington treated her with epidural injections which helped her pain temporarily.
5. Dr. Aikenss impression when he referred plaintiff to the Pain Center was
 "That we had a source of pain that was not immediately apparent but it was a severe pain and was greatly affecting her, and that we needed to look further to see if there was anything we hadn't picked up.
 When I saw her back on the 20th to follow up on the CT scan, my assessment was puzzling right flank pain. Today, the findings seemed to suggest more it might be due to a hidden fracture, perhaps the transverse process or proximal rib fracture. In the transverse process, parts of the bone stick off the spinal column. Sometimes they can crack and be hard to — see we got thoracic spin films and right rib details. If that was negative, we were going to go with the MRI scan. So we did that.
 On March 20th, the thoracic spine was negative, the right rib details were negative.
 On March 25th, we did an MRI of the thoracic spine, looking for any sign of a disc or abscess or mass or tumor. Sometimes you get a bizarre tumor causing pain like this. That's what I really was afraid of, it might be a tumor, but it was negative. There was no tumor. The MRI is a very high resolution test. We also did a bone scan after that, April 17th, nuclear medicine bone scan that would look for something within the rib or within the bones not visible on x-ray, and it was negative.
 I feel now, in retrospect with that history of falling and hitting her right flank she had an injury to a nerve there in the right flank that is permanently injured and causing her chronic pain. The other thing that leads me to think that is that the injections would give temporary relief for a while when the signals were stopped from that area that nerve."
6. John Polson denied that he was told on January 2, 1998, that plaintiff had fainted in the cab where she was working and had hurt her back. His testimony was that he first saw plaintiff at around 6 a.m. making coffee in the office, prior to the start of work. Then at 6:30 a.m., still prior to the start of work, plaintiff came to his office and said she was sick.
 She seemed nauseated. She said she was having pains in her chest and her side. She really looked bad and was sick. I tried to get her to go home and go to the doctor, but she said she wanted to stay and try to make it.
He said when he saw plaintiff about three hours later Tonya was on one side of her and Helen was on the other. They said they were going to take her home and he said "fine".
7. The nausea and fainting episode caused by the fumes constituted an interruption of the work routine and the resulting injury was an injury by accident within the course and scope of employment and is compensable under the workers compensation act. The employer had actual knowledge of the accident and injury on the day it occurred. The injury by accident resulted in plaintiffs disabling condition that rendered her unable to earn any wages from January 2, 1998, to the date of the hearing before the Deputy Commissioner and continuing. The injury led to chronic pain that led to depression. The chronic pain resulting from her fall at work is a significant contributing factor to development of her depression.
8. Defendants sent plaintiff for an evaluation by Dr. Gerald Aronoff, a pain specialist and psychiatrist and Dr. Michael Nesbit, a neurologist. During cross examination of Dr. Aronoff it was developed that he had been disciplined by the Commonwealth of Massachusetts after being found guilty of practicing medicine deceitfully or engaging in conduct which has the capacity to deceive or defraud. After one visit with plaintiff of less than 3 hours Dr. Arnoff found that in his opinion, the plaintiff was not injured, was able to work and was likely a malingerer. The Full Commission finds Dr. Aronoffs testimony not to be credible or reliable. Dr. Nesbit also found that, in his opinion, plaintiff had no disabling injury, although he said "I have no reason not to believe that she fell and bruised her back. He also said it was possible that the fall plaintiff described could have caused the problems that Dr. Aikens has identified and related to her injury. The Full Commission also gives little weight to the testimony of Dr. Nesbit.
9. Following her injury and resulting absence from work, plaintiff received four weeks of temporary unemployment compensation and thirteen weeks of short-term disability compensation, both of which were arranged by her employer. Her injuries and resulting chronic pain and depression have kept her from earning any wages in her former or any other occupation. Said Dr. Aikens:
 "At one point, she really wanted to go back to work, and it was not something I really thought she was ready for, but she wanted to try it very badly. I believe she tried something. I don't know if it was Fontaine or a similar company, I don't remember the details, but I remember after two or three days, it was too much for her. She couldn't do it. She was in terrible pain the whole time."
10. Dr. Aikens described plaintiffs condition in May and June of 1998:
 "She has continued in terrible pain. I do believe it is real pain — awful pain, daily pain. Her life has changed. She walks with a cane. She has to be careful driving in a car, she braces up her side a lot of times because it hurts to move around the car. She's not been able to exercise, used to be a fit person who played baseball and softball and other sports, very trim and fit. She's gained a tremendous amount of weight not being able to exercise. I'm sure the depression fed in too. Were trying to help her with the pain, with the depression, try to encourage her not to gain weight if at all possible. Its been very difficult. She's steadily gained weight. She's gained just about 55 pounds. And this hasn't helped anything with the excess weight, of course."
 "She's on Elavil, very high doses, which is a medication that really does help with chronic pain, by helping brain transmitters to be improved so you don't feel pain as much, but unfortunately, one of the main side effects is weight gain. She's just gained a lot of weight. She's just been miserable with this. When she comes in, I try to help her think of other ways to try to deal with the pain, particularly working with Dr. Covington and Dr. Zucadas and the pain center, and I sent her to vocational rehabilitation because she was in great financial difficulty, couldn't afford some of the medicines we recommended. Wanted to try and get her off some of the things and try other things, but she couldn't afford to buy them. So, that became a big issue, and I said maybe vocational rehabilitation can help you pay bills and try to get back on your feet so you can get back to work. She did what I asked her to do. She went to voc-rehab. They tried for a while and they, I believe, suggested some other things."
 "Diagnosis is injury to a nerve root in the right flank area that borders the right rib margin. That would be about the T-9 dermatome, somewhere in that area. It is a permanent injury to that nerve. I think the nerve was perhaps stretched or actually ruptured and tried to heal, but it left her with debilitating chronic pain, and I don't think its going to get much better than this."
 "I recommend that she not work, that she stay on medications for chronic pain relief, that she continues to try new pain therapies as they present themselves and are developed. In other words, she needs to stay in touch with the pain center the pain clinic here at the hospital, other pain centers that might have specialties that would help her more and recommended she be on ongoing antidepressants continuously. That would be the main things we should do."
11. Plaintiff will be in need of continuing medical care for her chronic pain and for her depression, both of which resulted from her compensable injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to receive workers compensation benefits, a plaintiff has the initial burden of first proving the existence of a disability as well as the extent of that disability. Hendrix v. Linn-Corriher-Corp., 317 N.C. 179,185, 345 S.E.2d 374, 378 (1986). To prove that she has a disability, the plaintiff must show that she has an injury by accident that has caused her to be unable to earn wages in her past work, unable to earn wages in any other work, and that her disability is caused by her injury. Hillard v. Apex Cabinet Co, 305 N.C. 593, 595,290 S.E.2d 682, 683 (1982). Plaintiff has met these burdens.
2. Plaintiff is entitled to medical care for her chronic pain and resulting depression, both past and in the future, to the extent that such care tends to decrease pain, lessen the period of disability or provide a cure.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to the attorney fees set forth below, defendants shall pay to plaintiff compensation at the rate of $xxx per week from January 2, 1998, and continuing until plaintiff is able to earn wages or until further order of the Industrial Commission. Compensation that has accrued to date shall be paid in a lump sum. Defendants shall pay 25% of the lump sum to plaintiffs attorney and shall thereafter pay every fourth check to plaintiffs attorney.
2. Defendants shall pay for all medical services that have reasonably resulted from the compensable injuries in accordance with N.C. Gen. Stat. 97-25 and 97-25.1, both past and continuing in the future.
3. Defendants shall pay the costs.
This 15th day of February 2001.
 S/_____________ THOMAS J. BOLCH COMMISIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER